IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRUSTEES OF THE UTAH CARPENTERS' AND CEMENT MASONS' PENSION TRUST,<br><br>    Plaintiffs,<br><br>v.<br><br>INDUSTRIAL POWER CONTRACTORS PLANT MAINTENANCE SERVICES, ET AL.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:09CV929DAK<br><br>Judge Dale A. Kimball |
| TRUSTEES OF THE UTAH CARPENTERS' AND CEMENT MASONS' PENSION TRUST,<br><br>    Plaintiffs,<br><br>v.<br><br>JERRY W. CARLSON, ET AL.,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:10CV334DAK<br><br>Judge Dale A. Kimball |

Both of the above-captioned cases are before the court on Plaintiff Trustees of the Utah Carpenters' and Cement Masons' Pension Trust's Motion for Partial Summary Judgment in Case No. 2:09cv929DAK, and Plaintiff's Motion for Summary Judgment and Defendant's Motion to Dismiss and Motion for Summary Judgment in Case No. 2:10cv334DAK. On October 12, 2011,

the court held a hearing on the motions.[1] Plaintiff was represented by Adam P. Segal and Brian King, and Defendants were represented by Florence Vincent. The court took the motions under advisement. Having fully considered the motions, memoranda, affidavits, and exhibits submitted by the parties and the facts and law relevant to the motions, the court enters the following Memorandum Decision and Order that shall be docketed in both cases.

## BACKGROUND

Plaintiff The Trustees of the Utah Carpenters' and Cement Masons' Pension Trust ("Trust") is a multi-employer pension plan providing pension benefits to carpenters, millwrights, and cement masons employed by employers operating in Utah who have contributed to the Trust on behalf of their employees. Defendant Industrial Power Contractors Plant Maintenance Services ("IPC") contributed to the Trust for several years, ending in April 2003. IPC is the dba for Plant Maintenance Services, a Utah corporation whose ownership shares are owned entirely by Defendant Jerry W. Carlson. Carlson is the sole owner of several other businesses, including Castle Valley Landscaping & Rental, Advantage Wireless of Cougar Lane, Rocky Mountain Miners, Inc., and Castle Valley Services, Inc. (collectively, "Carlson Entities").

Carlson testified that he believed IPC was obligated to contribute to the Trust because it employed union members who participated in the Trust. IPC paid all Trust contributions it was required to pay during the time it was participating in the Trust. During the time that IPC

---

[1] In Case No. 2:09cv929, Plaintiff has a pending motion for leave to filed an Amended Complaint to add an additional Defendant, Price Mine Service, Inc. The new Defendant is alleged to be a part of the control group, which are named a defendants in the 2:10cv334 case. The motion was never opposed and was not brought to the attention of the court at the hearing on the pending dispositive motions. The court grants the motion based on Defendants' failure to respond. Accordingly, Plaintiff may file its Amended Complaint within five days of the date of this Order.

contributed to the Trust, if IPC was late in making its payment, it would pay the resulting late payment the Trust demanded.

On July 19, 2007, the Trust sent IPC a demand for withdrawal liability, informing IPC that the Trust had experienced a mass withdrawal as of December 31, 2006. The Trust's demand letter explained that, effective December 31, 2006, IPC became liable because a de minimis withdrawal liability rule no longer applied to IPC's withdrawal liability.

In 1980, Congress enacted the Multiemployer Pension Plan Amendments Act ("MPPAA"), an amendment to ERISA, to protect employees' pensions when employers cease to contribute to a pension plan. 29 U.S.C. § 1381. An employer that ceases its contributions to a pension plan is liable for its pro rata share of the unfunded vested benefit liability ("UVBL") for each plan year prior to the plan year of the withdrawal. *Id.* § 1391. Once this withdrawal liability exists, the pension plan must notify the employer of the amount, demand payment, and provide a repayment schedule. *Id.* § 1399(c). If the employer disputes the liability within 90 days of the plan's demand, it may request a review from the plan. *Id.* § 1399(b)(2)(B). And, if disputes persist after that review, the employer may initiate arbitration within the following 60 days. If there is no arbitration, the amounts demanded are due and collection can be enforced in court. *Id.* § 1401(b)(1). At no time did IPC, Carlson, or the Carlson entities request a review of the withdrawal liability claim or initiate a withdrawal liability arbitration to dispute anything related to the Trust's assessment and demand.

The Trust sent its July 2007 demand letter to IPC at its West Canyon Road address and its post office box address. The Trust did not respond to the demand. On August 12, 2008, the Trust sent IPC another demand for $23,680 in withdrawal liability using IPC's Lawndale Drive address. IPC did not respond to the demand. On October 13, 2009, the Trust sent IPC copies of

3

the July 2007 and August 2008 withdrawal liability demands using IPC's West Canyon Road address.  IPC did not respond to the October 2009 demand.

On October 14, 2009, the Trust sued IPC for withdrawal liability and the Complaint included a copy of the Trust's original withdrawal liability demand ("IPC suit").  On November 10, 2009, a Carbon county sheriff personally served Carlson with the IPC Complaint that included the original withdrawal liability demand.  IPC did not respond to the withdrawal liability demand attached to the Complaint.  IPC's owner, Carlson, also did not respond to the Complaint because he did not believed that it was necessary to do so for a defunct corporation.

On April 14, 2010, the Trust filed another action against Carlson and the Carlson entities alleging that they were liable for IPC's withdrawal liability ("Carlson suit").  Almost a month later, on May 4, 2010, the Trust moved for default judgment against IPC in the IPC suit.  A week later, on May 11, 2010, counsel for IPC, Carlson, and the Carlson entities called the Trust's counsel and acknowledged both the IPC suit and the Carlson suit.  However, no effort was made to defend the IPC case.  On July 7, 2010, the court entered default judgment against IPC for $50,098.27 in withdrawal liability, interest, liquidated damages, fees, and costs in the IPC suit.

Nine months after default judgment was entered in the IPC suit, IPC moved to set aside default judgment.  The court set aside the default judgment finding that it was not unreasonable for Carlson, a layperson, to believe that a defunct corporation was not required to respond, stating that the court prefers to decide matters on the merits, and concluding that there was no prejudice to the Trust.  At the time that IPC moved to set aside the default judgement in the IPC suit, the Trust had filed its motion for summary judgment against Carlson and the Carlson entities in the Carlson suit.  After the court lifted the default in the IPC suit, the Trust filed a motion for summary judgment in that case as well.  The Carlson case was also transferred to this court so

that both actions would be in front of the same judge.

## DISCUSSION

Because the issues presented in the parties' motions overlap significantly, the court will address the motions together. The Trust argues that IPC failed to arbitrate the Trust's withdrawal liability assessment so the amount is due and owing under the MPPAA. The Trust also argues that Carlson and the Carlson Entities are liable for IPC's withdrawal liability under a control group theory. IPC argues that the MPPAA does not apply to this case and it was not required to arbitrate anything with respect to the withdrawal liability. Even if the MPPAA applies, IPC asserts that it can maintain the defenses of laches and statute of frauds. Defendants also argue that the Carlson suit should be dismissed because IPC is an indispensable party but was not named as a defendant.

The initial question in both cases, therefore, is whether the MPPAA applies. Defendants argue that if there is no collective bargaining agreement, then the MPPAA does not apply. The Trust, however, argues that the MPPAA applies in either event because IPC made payments into the Trust and acted as if it was subject to a collective bargaining agreement.

During the course of briefing the motions, the Trust submitted a collective bargaining agreement between a Washington-based IPC and the United Brotherhood of Carpenters and Joiners of America. There is a factual dispute, however, as to whether the submitted collective bargaining agreement is an agreement between the Trust and IPC's predecessor in interest. Defendants state that they have no relationship with the IPC in the submitted collective bargaining agreement. The Trust, however, states that in 1989, IPC was a Washington-based company whose principals included Donald McKillop and William Dunbar. In November 1989, Dunbar and Carlson formed IPC in Utah. The Trust acknowledged the address change in its

records. During that time, the carpenter's union affirmed to the Trust that IPC was bound by a labor agreement multiple times. Defendants never disputed IPC's signatory status until they filed their Answer in the Carlson suit.

In any event, the Trust argues that it can enforce IPC's withdrawal liability with or without a signed collective bargaining agreement. Case law states that withdrawal liability does not arise pursuant to any labor agreement. Withdrawal liability is a noncontractual liability that "is not an obligation or liability under the union contract." *Debreceni v. Healthco D.G. Stoughton Co.*, 579 F. Supp. 296, 297 (D Mass. 1984). The Trust states that it is not seeking any amounts due under a labor agreement. Rather, it is seeking withdrawal liability under the MPPAA based on IPC's payments into the system.

Uunder the MPPAA, an "employer" who is required to arbitrate its withdrawal liability disputes is not limited to entities who have signed a labor agreement. The term "employer" under the MPPAA includes any entity that "acts as an employer" with respect to a pension plan. Contributing to the plan is the most fundamental way in which an entity acts as an employer.

An entity that contributes to an ERISA pension plan and receives a withdrawal liability notice must arbitrate its withdrawal liability defenses. Only entities that are true strangers to the pension plan and are surprised by the withdrawal liability are permitted to raise that issue for the first time in court. Being a stranger to the collective bargaining agreement, as asserted by IPC, is irrelevant. Only an entity that is a stranger to the Trust could escape mandatory arbitration. IPC, having a long history of contributing to the Trust, cannot claim to be such a stranger. It is IPC's own contributions that have led to the unfunded pension liability the law now requires to be paid to the Trust.

The distinction between "surprise" cases and those where an employer's defenses were

waived when not arbitrated was thoroughly explained by the Seventh Circuit in *Central States, Southeast and Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992). In *Slotky*, the court addressed the issue of whether potential liability based on membership in a control group had to be arbitrated. The court explained that if the Easter Bunny got sued, arbitration was not required because there was no basis for anyone in the allegedly overlapping businesses to think the Bunny might be included as an "employer." *Id.* at 1373-74. But, if a member of one of the overlapping businesses was sued who may have had some potential liability under a control group theory, then that person's status as a "employer" should have been determined in arbitration. *Id.* at 1373.

In this case, IPC admits that it contributed to the Trust on behalf of its union employees for several years. IPC is not caught off guard by the lawsuit like the Easter Bunny would be. In *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1250-51 (3d Cir. 1987), the court ruled that the defendant, having clearly been a contributing "employer" at one time, was required to arbitrate its "employer" status with regard to withdrawal liability. In this case, IPC was clearly an employer contributing to the Trust. Only where the employer has never, directly or through a control group member, contributed to a pension plan, have courts allowed "employer" status to be raised for the first time in court.

IPC did nothing to assert its alleged defense regarding "employer" status and, instead, waited until the Trust filed suit against it to do so. After IPC's history of contributing to the Trust, the court need not revisit whether IPC was an employer. IPC should have arbitrated the issue. All issues arising under the MPPAA, 29 U.S.C. §§ 1381-199, must be arbitrated. What constitutes an "obligation" to contribute is governed by 29 U.S.C. § 1392, a statute clearly within those requiring arbitration. Having elected not to arbitrate that issue, IPC has waived the issue.

7

Even if IPC's argument regarding a "signed" agreement is not waived for failure to arbitrate, IPC has not presented any authority under the MPPAA for its proposition that the Trust must present a signed agreement.  Courts, on numerous occasions, have found that an employer is bound by an unsigned agreement.  "'[A] signature to a collective bargaining agreement is not a prerequisite to finding an employer bound to that agreement.'" *See Line Construction Benefit Fund v. Allied Electrical Contractors, Inc.*, 591 F.3d 576, 578  (7th Cir. 2010) (quoting *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration*, 385 F.3d 761, 767 (7th Cir. 2004).  "Assent can also be established through other evidence, including most importantly conduct manifesting agreement, such as . . . the payment of fringe benefit contributions." *Id.*  Where, as here, it is undisputed that IPC contributed to the Trust for several years and reported to the Trust regarding those contributions, an actual signature is irrelevant in collecting withdrawal liability.

One of the cases cited by Defendants actually holds that the employer's "course of conduct" in making payments in accordance with an unsigned collective bargaining agreement demonstrates assent to be bound to that collective bargaining agreement and creates delinquent contribution liability under ERISA.  *Line Construction Benefit Fund v. Allied Electrical Contractors, Inc.*, 591 F.3d 576, 578  (7th Cir. 2010).  The Seventh Circuit has held that "we have held repeatedly that conduct manifesting assent creates an obligation; a contrary rule would ignore commercial realities and would create a loophole for parties seeking to escape responsibilities that they have acknowledged through their behavior." *Id.* at 541.

The *Line Construction* decision is also consistent with the general rule that a new employer will be held to the terms of the former employer's collective bargaining agreement when the new employer expressly or impliedly assumes the obligations of the predecessor's

contract. *See also Southern Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127, 1131 (9th Cir. 2004); *Ameristeel Corp. v. Int'l Bhd. Of Teamsters*, 267 F.3d 264, 273-75 (3d Cir. 2001); *Southward v. S. Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 492-93 (6th Cir. 1993). The relevant inquiry is whether the second employer has displayed conduct manifesting an intention to abide by the terms of the agreement. *Southern Cal. Painters*, 359 F.3d at 1133.

In this case, IPC contributed to the Trust on behalf of its employees. The Trust had information in its files that IPC in Utah was a successor to the IPC in Washington that had a collective bargaining agreement. Carlson testified that IPC in Utah began and continued to pay into the Trust because it employed union employees. It is undisputed that IPC contributed to the Trust for several years, reported to the Trust regarding those contributions, paid late payment liquidated damages, and otherwise performed in compliance with the agreement. Based on such conduct, Carlson's actual signature on a collective bargaining agreement is unnecessary in collecting withdrawal liability.

IPC argues that this case differs from many of the cases cited by the Trust because the defendants in those cases were aware of the collective bargaining agreement. Whereas, IPC claims that there is no evidence that IPC knew of or agreed to any collective bargaining agreement. However, Defendants' argument mischaracterizes the state of the evidence in this case. Carlson testified that he made the payments because the employees were union employees. The evidence shows that IPC acted in accordance with the agreement when it made the payments into the Trust. That evidence, therefore, demonstrates some knowledge of a collective bargaining agreement or obligation. Accordingly, Defendants' arguments are waived for failure to arbitrate, irrelevant under the statutory obligation, and without merit given IPC's continued

course of conduct in compliance with a collective bargaining agreement.

In both cases, the Trust moves for a determination of withdrawal liability with respect to IPC, Carlson, and the Carlson Entities. First, as for IPC, the Trust argues that IPC was required to arbitrate to preserve any defenses to the Trust's withdrawal liability assessment. Pursuant to 29 U.S.C. § 1401(a)(1), "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under section 1381 through 1399 of this title shall be resolved through arbitration." In the Tenth Circuit, an employer who fails to initiate arbitration as prescribed in the withdrawal liability statutes waives any defenses to the liability that could have been arbitrated. *Trustees of the Colorado Pipe Industry Pension Trust v. Howard Electrical & Mech. Inc.*, 909 F.2d 1379, 1382-83 (10th Cir. 1990).

The Tenth Circuit has stated that "[a]rbitration reigns supreme under the MPPAA." *Colorado Pipe*, 909 F.2d at 1385. "Failure to initiate arbitration within the statutory period has a harsh result – the amount demanded by the pension plan sponsor becomes due and owing." *Id.* The Tenth Circuit explains that "[i]n enacting the MPPAA, Congress sought to channel disputes over the withdrawal liability into the informal and expeditious procedure of arbitration." *Id.* The court recognized the severity of the arbitration requirement, but indicated that "Congress deemed that this harsh remedy was appropriate when it enacted the MPPAA and we decline to second-guess its judgment." *Id.* at 1386-87.

Relying on *Colorado Pipe*, the Trust argues that IPC has waived all possible defenses to payment of the withdrawal liability by failing to arbitrate. An employer who believes that the plan improperly delayed in sending a withdrawal liability demand must arbitrate that issue. *Bowers v. Transportation Maritima Mexicana*, 901 F.2d 258, 262 (2d Cir. 1990). The issue of whether an employer has withdrawn from a plan is a factual issue that also must be raised in

arbitration. *RAO v. Prest Metals*, 149 F. Supp. 2d 1, 8 (E.D.N.Y. 2001). Even where there are questions as to whether the pension plan had any basis to assess withdrawal liability, the failure to arbitrate is fatal. *Trustees of the Utah Carpenters' and Cement Masons' Pension Trust v. New Star/Culp L.C.*, 2009 WL 321573 at *3 n.2 (D. Utah Feb. 9, 2009). Employers who contributed to a plan but argue that there was no signed labor agreement must also arbitrate that issue. *ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 884-87 (2d Cir. 1988).

Under *Colorado Pipe*, however, IPC argues that it may still raise a laches defense. The MPPAA requires plans to pursue collection of withdrawal liability "as soon as is practicable." 29 U.S.C. § 1399(b)(1). Laches is a valid defense in an action for withdrawal liability and is not waived by a failure to request arbitration. In *Colorado Pipe*, the court recognized that "because 'a failure to arbitrate does not waive a defense that the employer does not yet have,' an employer who fails to arbitrate may still assert a laches defense in a subsequent collection action." 909 F.2d at 1385-86.

In this case, IPC argues that laches should apply because IPC withdrew from the plan effective April 2003 and the Trust did not make a demand for payment until July 2007. The Trust waited more than four years before making a demand and almost two additional years before commencing litigation.

However, IPC erroneously claims that its laches defense may be applied to the entire time from IPC's withdrawal to the time that the Trust brought this lawsuit. Because IPC's liability was below MPPAA's de minimis amount, IPC owed nothing until December 30, 2006, when the Trust experienced a mass withdrawal. The Trust notified IPC of this liability seven months later, and then repeatedly attempted to contact IPC for two years until it filed suit. This is not an unreasonable delay. In addition, there can be no laches defense where, as here, the statute of

limitations has not run. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1208 (10th Cir. 2001) ("[W]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period."). The statute of limitations under the MPPAA is six years. The Trust filed suit within two years of its cause of action arising. Moreover, IPC has not demonstrated any prejudice.

IPC also argues that the Trust's claims are barred by the statute of frauds. *Colorado Pipe* recognized that arbitration may be bypassed in cases involving "questions of statutory interpretation outside the MPPAA." 909 F.2d at 1382. IPC contends that whether Utah's statute of frauds applies to the alleged contract in this case is a question of statutory interpretation outside the MPPAA. In this case, IPC made monthly contributions to the Trust from April 1998 to August 2003. The Trust also maintains that IPC's obligations continued well beyond its alleged withdrawal from the plan. Thus, IPC contends that the agreement could not be performed within one year and it falls within the statute of frauds.

IPC's reliance on the statute of frauds, however, fails to recognize that withdrawal liability under the MPPAA is a statutory obligation not a contractual obligation. The Trust does not claim that IPC owes anything under IPC's labor agreement. Withdrawal liability does not arise pursuant to the labor agreement; it is a noncontractual liability that is not an obligation under the union contract. The statute of frauds, therefore, does not apply.

The court concludes that IPC has not demonstrated that there are any applicable defenses to the withdrawal liability that did not need to be arbitrated. The next question presented, therefore, is whether IPC's liability applies to Carlson and the other Carlson Entities under a control group theory.

Federal law provides that all members of a control group are liable for the withdrawal

liability of any other control group member. An "employer" required to arbitrate its withdrawal liability disputes includes all "trades or businesses (whether or not incorporated) which are under common control." 29 U.S.C. § 1301(b)(1). This includes instances when five or fewer individuals own at least 80% of each entity. 26 U.S.C. § 414(c): 26 C.F.R. § 1.414(c)-2(c). Here, it is undisputed that Carlson owns 100% of IPC and each of the Carlson Entities and has both a controlling interest in and effective control over all such entities.

The notice of withdrawal liability to IPC and its failure to arbitrate is binding on any members of a control group with IPC. Neither Carlson nor the Carlson Entities have made any effort to initiate arbitration. As with IPC, any defenses Carlson or the Carlson Entities seek to raise now have been waived.

The waived defenses include any claim that the Carlson Entities were not in a control group with IPC. The only control group issues that need not be arbitrated are (1) control group status in cases where the alleged control group member received no notice of the claim and had no reason to believe it might be deemed a member of a control group, and (2) where the pension fund does not assert that the issue of control group status must be arbitrated. *Chicago Truck Drivers, Helpers, and Warehouse Workers Union Pension Fund v. El Paso CGP Co.*, 2005 WL 2737072 at *7-8 (N.D. Ill.). Even a former control group member who left the control group will lose the ability to raise that argument if it receives actual notice of the claims yet ignores it and waits to be sued. *Chicago Truck*, 525 F.3d 591, 600-01 (7th Cir. 2008).

Defendants argue that the Trust's claims are barred because the Trust failed to follow the requisite procedures to perfect its arbitration defense. Defendants contend that no claims were made against them until after the arbitration deadline had allegedly passed. The Trust gave notice to and brought suit first against only IPC. The Trust did not bring a claim against

Defendants until months after IPC failed to request arbitration or respond to the IPC suit.

The Trust argues that it complied with all MPPAA arbitration provisions. IPC's failure to arbitrate is effective and binding on all members of the control group. *O'Connor v. DeBolt Transfer, Inc.*, 737 F. Supp. 1430, 1434 (W.D. Pa. 1990) (one control group member's failure to arbitrate waived all defenses of all control group members, which were all solely owned by one individual). In this case, where Carlson owns all of IPC and all of the Carlson Entities, liability extends equally to the Defendants, jointly and severally. The IPC complaint was served on Carlson personally. He knows that he controls all of the Carlson Entities. Because the Carlson Entities are all wholly owned and controlled by Carlson, there is no surprise that all of Carlson's entities would be considered one control group for liability purposes. Moreover, Carlson is personally liable for the withdrawal liability owed by Advanced and Castle because they are unincorporated sole proprietorships. Utah law extends protection from personal liability only to corporations. Withdrawal liability applies jointly and severally to the employer and its control group members.

Procedurally, Defendants argue that the Carlson suit should be dismissed for failure to name IPC. Federal Rule of Civil Procedure allows an action to be dismissed for failure to join an indispensable party under Rule 19. However, IPC is not a necessary or indispensable party to the Carlson action because withdrawal liability applies jointly and severally to the employer and its control group members. Carlson owns 100% of IPC and all the Carlson Entities. Because of joint and several liability, it is not necessary to bring a simultaneous action against each of them and none is indispensable in an action against another. *See Jett v. Phillips & Assocs.*, 439 F.2d 987, 990 (10th Cir. 1971).

In *Central States, S.E. & S.W. Areas Pension Fund v. Lloyd L. Sztanyo Trust*, 693 F.

Supp. 531 (E.D. Mich. 1988), the court rejected the argument by several members of the control group who asserted that they had been indispensable parties in a prior action against only the actual employer. *Id.* at 541. The court explained that "an individual joint obligor is not an indispensable party to an action against one or more of the joint obligors. Additionally, where a joint obligor is severally liable, that obligor is merely a proper party to an action, rather than a necessary party." *Id.* Therefore, the court concludes that IPC is not an indispensable party in the Carlson suit and there is no procedural basis for dismissing the case.

      Having determined that IPC, Carlson, and the Carlson Entities are subject to withdrawal liability jointly and severally and that no defenses to that liability have merit, the court must determine the amount of withdrawal liability due and owing. The Trust asserts that the amount due is easily determined under the applicable law. The Trust is entitled to withdrawal liability, interest, liquidated damages, legal fees, and costs. The amount of withdrawal liability plus interest and liquidated damages requested by the Trust is $50,098.27. The court finds this amount well documented and reasonable. Therefore, the court concludes that the Trust is entitled to judgment against Defendants jointly and severally in the amount of $50,098.27. The court also grants the Trusts request for leave to establish legal fees and costs by motion after judgment is entered.

      However, due to Plaintiff's outstanding motion to amend its complaint in Case No. 2:09cv929 to add an additional Defendant who may be subject to control group liability, the court cannot direct the Clerk of Court to close the case and enter judgment against IPC, Carlson, and the Carlson Entities as would typically occur. In this Order, the court has granted Plaintiff's motion for leave to amend and directed Plaintiff to file its Amended Complaint within five days of the date of this Order. Case 2:09cv929, therefore, is not concluded. If judgment is not entered

against IPC in Case No. 2:09cv929, the court has questions as to whether judgment can be entered under a control group theory in Case No. 2:10cv334. The parties may file memoranda as to whether judgment should be entered under Rule 54(b) as to IPC in Case 2:09cv929, rather than waiting for the proceedings against Price Mine Service, Inc. to conclude, and as to whether judgment may be entered against Carlson and the Carlson Entities in Case No. 2:10cv334 at this time. The parties shall file these briefs regarding a Rule 54(b) judgment and judgment in Case No. 2:10cv334 within 15 days of the date of this Order.

## CONCLUSION

Based on the above reasoning, in Case No. 2:09cv929DAK, Plaintiff Trustees of the Utah Carpenters' and Cement Masons' Pension Trust's Motion for Partial Summary Judgment is GRANTED, Plaintiff's Motion for Leave to File Amended Complaint is GRANTED and, in Case No. 2:10cv334DAK, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion to Dismiss and Motion for Summary Judgment is DENIED. This Memorandum Decision and Order shall be docketed in both cases. Plaintiff's Amended Complaint in Case No. 2:09cv929 shall be filed within five days of the date of this Order. The parties' briefs as to entry of judgment under Rule 54(b) against IPC in Case No. 2:09cv929 and entry of judgment against Defendants in Case No. 2:10cv223 shall be filed within fifteen days of the date of this Order.

DATED this 8th day of December, 2011.

BY THE COURT:

*Dale A. Kimball*
DALE A. KIMBALL
United States District Judge